**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
CHRISTOPHER MELLING, :
:
    *Plaintiff*, : **No. 18-Civ-3514 (ARR)**
:
v. :
: **AMENDED COMPLAINT**
HAMILTON POINT INVESTMENTS LLC, :
:
    *Defendant*. :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

   Plaintiff Christopher Melling, by his attorneys, Eversheds Sutherland (US) LLP, for this amended complaint against Hamilton Point Investments, LLC ("HPI"), alleges upon knowledge with respect to himself and his own acts, and upon information and belief with respect to all other matters, as follows:

**NATURE OF THE ACTION**

   1. This action seeks payment under the unambiguous terms of a written contract, as well as an accounting sufficient to establish the proper amount of that contractual payment.

   2. Plaintiff Melling was engaged by Defendant HPI to market and raise capital for HPI's private-equity investment funds for approximately four years, from May 2010 until April 2014.

   3. Mr. Melling and HPI had multiple agreements over the years setting forth his primary responsibilities and/or compensation in connection with three of HPI's investment funds. According to those agreements, one component of Mr. Melling's compensation in connection with his work for each of the three investment funds included a percentage of the

1

"gross promote"—in essence, a specified percentage of HPI's profits from certain of its investment funds.

4.      Upon his separation from HPI in 2014, Mr. Melling executed with the company a settlement agreement memorializing and reserving his unconditional right to specified percentages of HPI's gross promote for each of the three funds.

5.      HPI understood its obligations under the compensation and settlement agreements, and, for nearly four years, appeared to comply with them.  With respect to the first two investment funds, HPI made full payment to Mr. Melling of his agreed percentage of the gross promote of the respective funds.

6.      But in February 2018, when HPI made the payment relating to the final fund, Mr. Melling had reason to believe the amount paid was less than half what he was owed.  Since HPI alone has access to the information needed to confirm the proper amount of the payment, Mr. Melling raised his concerns to HPI shortly after receipt of the payment and requested an accounting or further information.

7.      At first, HPI insisted that its payment was "correct," emphasizing that the computations had been very complicated, but otherwise ignored Mr. Melling's request for proof of performance.

8.      But when HPI's lawyers got involved, HPI's story changed.  HPI then claimed that neither the parties' original compensation agreement nor the parties' settlement agreement, under which HPI had been performing for nearly 4 years, gave Mr. Melling any enforceable right of payment.  HPI further claimed that any rights Mr. Melling might have had under prior agreements were forfeit when HPI terminated his employment.  HPI asserted that its nearly

2

$400,000 payment to Mr. Melling in February 2018 had been a "discretionary bonus," paid without reference to or obligation under any agreement between the parties.

9.      HPI's arguments are baseless and in bad faith, and Mr. Melling now asks this Court to enforce his clear contractual rights.

## PARTIES

10.     Plaintiff Christopher Melling is an individual who resides at 1 John Street, Apartment 10B, Brooklyn, New York 11201.

11.     Defendant HPI is a limited liability company incorporated under the laws of Delaware, with its principal offices at 2 Huntley Road, Old Lyme, Connecticut 06371.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 because the parties are completely diverse and the amount in controversy exceeds $75,000.

13.     This Court has jurisdiction over the parties pursuant to Section 302(a)(1) of New York's Civil Practice Law and Rules because HPI transacts business within the State of New York.

14.     As set forth below, HPI has purposefully availed itself of New York's real estate and investment market, including but not limited to its employment of Mr. Melling to offer and sell real estate securities and to raise investment funds in and from New York, and Mr. Melling's claims bear a substantial nexus to HPI's purposeful activity in New York.

15.     Venue lies in this District pursuant to 28 U.S.C. § 2391 because Mr. Melling resides herein and a substantial part of the events giving rise to the claim emanated from this District.

## STATEMENT OF FACTS

### The Business of HPI

16.    HPI is a private-equity investment company that owns and manages multifamily apartment properties.

17.    HPI was founded in 2010 by managing principals Matthew Sharp and J. David Kelsey, both veterans of the New York real estate investment and banking industries.

18.    HPI purchases its investment properties using money raised from individual accredited investors across the United States, including New York, through a series of real estate private-equity investment funds.

19.    The investments, which are real estate syndications, are considered securities under New York law and are subject to and governed by the Martin Act, Article 23-A of the New York General Business Law, which regulates the offer and sale of securities in or from New York.  Upon information and belief, in accordance with the requirements of the Martin Act, HPI made legally required filings of its real estate syndications with the Real Estate Finance Bureau of the New York State Office of the Attorney General in order to be able to offer and sell the investments in or from New York to New York residents and others.

20.    During the course of Mr. Melling's employment with HPI, multiple New York investors bought interests in all three of the HPI funds on which Mr. Melling worked.  Indeed, HPI raised more than $3 million from New York resident investors on the first two funds alone. In addition, one of the funds on which Mr. Melling worked while at HPI acquired two investment properties through a joint venture with a New York hedge fund that contributed nearly $20 million to the enterprise.

21.    HPI has over 180 employees and has acquired properties containing over 12,000 apartment units and valued at approximately $1.1 billion.

4

<u>Mr. Melling's Work and Compensation</u>

22.      In or about May 2010, Mr. Melling was engaged by HPI to market and raise capital for HPI's private-equity investment funds.  Mr. Melling was engaged in part to take advantage of his contacts with investors in New York.

23.      Mr. Melling's initial title was Senior Vice President, Capital Markets and Investments. In June 2012, Mr. Melling's title became Principal.

24.      Mr. Melling's employment, responsibilities, and compensation were determined in a series of negotiations among Mr. Melling, Mr. Sharp, and Mr. Kelsey.

25.      These negotiations resulted in a series of term sheets and emails, sent to Mr. Melling by Mr. Sharp and Mr. Kelsey, memorializing Mr. Melling's position, responsibilities, and compensation.  True and correct copies of the term sheets are attached hereto at **Exhibit A**.

26.      Mr. Melling's key responsibilities included capital formation, business development, and investor relations.

27.      Mr. Melling's compensation included a combination of monthly cash payments, expense reimbursements, bonuses, and percentages of the "promotes" for the private-equity investment funds that Mr. Melling marketed and for which he raised funds.  A sponsor's "promote" or "carried interest" is the amount the sponsor of a real estate investment fund earns once the fund reaches a certain threshold of profits.

28.      By email to Mr. Melling dated June 7, 2012, Mr. Kelsey confirmed that Mr. Melling's carried interests in Fund I and Fund II were to be calculated from HPI's "TOTAL GROSS promote," which meant that the percentages were "NOT net of any seed investors."  A true and correct copy of this email is attached hereto as **Exhibit B**.

40960143.1

29.     During Mr. Melling's tenure with HPI, the company launched the following three private-equity investment funds:

a.      HPI Apartment Opportunity Fund I, LLC ("Fund I"). Fund I was launched in or around May 2010 and completed its cycle—meaning that all fund assets were liquidated and all investor capital repaid—in or around June 2015.

b.      HPI Apartment Opportunity Fund II, LLC ("Fund II"). Fund II launched in or around September 2011 and completed its cycle in or around September 2016.

c.      HPI Real Estate Opportunity Fund III, LLC ("Fund III"). Fund III launched in or around April 2013 and completed its cycle in or around February 2018.

30.     For Fund I, and as memorialized in the term sheets, Mr. Melling's compensation included "2% of promote of Fund I (up to $200,000 over 3-year life of fund)." *See* Exhibit A.

31.     For Fund II, and as memorialized in the term sheets, Mr. Melling's compensation originally included "4% of promote of Fund II." *Id.*

32.     As further memorialized in the term sheets, Mr. Melling's carried interest in Fund II was later increased to "10% of Fund II" in combination with other changes in compensation and titling. *Id.*

33.     For Fund III, HPI did not give Mr. Melling a term sheet. Instead, following a negotiation, HPI memorialized the terms of Mr. Melling's Fund III compensation through an email from Mr. Sharp to Mr. Melling, copying Mr. Kelsey, dated February 1, 2014, which

memorialized their agreement as follows: "It was same comp as now but with 10% gross promote."  A true and correct copy of this email is attached hereto as **Exhibit C**.

34.    At all times during Mr. Melling's employment with HPI, he worked half of his time in Connecticut out of the HPI office and half of his time in New York out of his home in Brooklyn.  Although it varied week to week, depending on the workload and type of activity at HPI, Mr. Melling typically worked two to three days in Connecticut and the rest of the week in New York.

35.    HPI was aware of Mr. Melling's working arrangement.

a.    It was mutually understood by Mr. Melling and HPI that Mr. Melling would try to spend half of his time in New York and half in the Connecticut office.

b.    Mr. Melling was not expected to work at the Connecticut office every day.

c.    Mr. Melling had to lease a car to travel the 120 miles back and forth from New York to Connecticut; for at least part of the time that Mr. Melling was employed by HPI, HPI reimbursed the portion of the car expenses related to his commute (approximately $250 of the $600 expenses per month were reimbursed).

d.    Mr. Melling also rented an apartment in Connecticut in order to cut down on the time spent commuting during the days that he worked in Connecticut.  After two years of paying for the apartment on his own, Mr. Melling requested that HPI reimburse him for the apartment as a business expense.  HPI agreed and the parties memorialized the agreement in

August 2012.  *See* Exhibit A.  Until Mr. Melling specifically asked for

reimbursement in 2012, HPI never offered to pay for the apartment.

36.    HPI actively collaborated and communicated with Mr. Melling while he was

working out of New York on HPI's behalf via email and telephone.

37.    As part of his employment, Mr. Melling solicited investors for Funds I, II, and III

from New York while working out of his New York apartment.

38.    As part of his employment, Mr. Melling solicited investors for Funds I, II, and III

who resided or had principal places of business in New York.

39.    As part of his employment, Mr. Melling met with investors in New York in

connection with Funds I, II, and III.  On occasion, Mr. Melling was joined by Mr. Kelsey and

Mr. Sharp at meetings in New York for the purpose of soliciting investors.  For example, Mr.

Kelsey and Mr. Sharp attended meetings in New York with two of the largest investors in

Fund I, one of whom was a New York resident.

<u>Mr. Melling's Settlement Agreement</u>

40.    On April 2, 2014, Mr. Sharp and Mr. Kelsey gave notice to Mr. Melling

terminating his employment with HPI, effective that day.

41.    In connection with that termination, HPI presented Mr. Melling with a draft

Confidential Settlement Agreement and General Release (the "Settlement Agreement").  The

Settlement Agreement was ultimately signed by Mr. Melling and Mr. Sharp after negotiation of

certain terms.  A true and correct copy of the final Settlement Agreement is attached hereto as

**Exhibit D**.

42.    HPI negotiated the terms of the Settlement Agreement via communications and/or

phone calls to Mr. Melling in New York.

8

43.     In consideration for signing the Settlement Agreement, HPI agreed to pay Mr.

Melling $35,000 as well as his vehicle allowance for the two months following his termination.

*See id.* § 2.

44.     Additionally, the Settlement Agreement memorialized and preserved certain of

Mr. Melling's rights.  Specifically, Mr. Kelsey stated in an email to Mr. Melling on May 15,

2014, that the agreement would "memorialize without alteration what we concretely agreed on

your promote share, ensure mutual non-disparagement, and mutually release each other."  A true

and correct copy of Mr. Kelsey's email is attached hereto as **Exhibit E**.

45.     Section 5 of the Settlement Agreement preserves Mr. Melling's interests in Funds

I, II and III, stating as follows:

> The foregoing release also does not impair, affect, waive, or release:
> (i) Melling's interest in the following funds or his rights under the
> agreements covering those funds: HPI Apartment Opportunity Fund
> I, LLC, HPI Apartment Opportunity Fund II, LLC, and HPI Real
> Estate Opportunity Fund III, LLC (the "Funds"). . . .

46.     Section 5 then memorializes Mr. Melling's exact interests in Funds I, II and III,

stating as follows:

> . . . (ii) Melling's carried interest in those funds as follows: (x) HPI
> Apartment Opportunity Fund I, LLC – Melling is to be paid 2% of
> the gross promote paid to the Company, (y) HPI Apartment
> Opportunity Fund II, LLC – Melling is to be paid 10% of the gross
> promote paid to the Company, (z) HPI Real Estate Opportunity
> Fund III, LLLC [sic] – Melling is to be paid 10% of the gross
> promote paid to the Company . . . .

47.     Section 16 clarifies that the Settlement Agreement supersedes all prior agreements

between the parties, stating as follows:

> This Settlement Agreement represents the entire agreement between
> the parties hereto and supersedes all prior agreements or
> understandings, written or oral, between the parties, except those
> governing the Funds referenced in Paragraph 5.

9

48.     The Settlement Agreement is governed by Connecticut law. *Id.* § 17.  The Settlement Agreement affirms Mr. Melling's right to enforce the Settlement Agreement, *see id.* § 5, and shifts attorneys' fees and costs to the prevailing party in any action to enforce or interpret it, *see id.* § 18.

49.     Mr. Melling, for his part, has adhered to and fully performed the terms of the Settlement Agreement.

<u>Early Compliance with the Parties' Compensation and Settlement Agreements</u>

50.     Initially, HPI partially complied with the parties' compensation and settlement agreements in the following respects:

a.     On or about June 2, 2014, HPI paid Mr. Melling the consideration due under paragraph 2(a)–(b) ("Consideration Payment").  True and correct records of the Consideration Payment are attached hereto as **Exhibit F**.

b.     On or about June 22, 2015, after Fund I completed its cycle, HPI paid to Mr. Melling $2,726.74 as his 2% share of the Fund I gross promote ("Fund I Payment"), in accordance with the terms of the parties' original compensation agreement for Fund I and Section 5 of the Settlement Agreement.  That payment was accompanied by a statement identifying the precise value of the Fund I promote and confirming the percentage of that promote being paid to Mr. Melling.  True and correct records of the Fund I Payment are attached hereto as **Exhibit G**.

c.     And on or about September 21, 2016, after Fund II completed its cycle, HPI paid to Mr. Melling $42,838.40 as his 10% share of the Fund II gross promote ("Fund II Payment"), in accordance with the terms of the parties'

amended compensation agreement for Fund II and Section 5 of the Settlement Agreement. That payment, like the Fund I Payment, was accompanied by a statement identifying the precise value of the Fund II promote and confirming the percentage of that promote being paid to Mr. Melling. True and correct records of the Fund II Payment are attached hereto as **Exhibit H**.

<u>The Fund III Payment</u>

51.     On or about February 5, 2018, after Fund III completed its cycle, HPI paid to Mr. Melling $398,461 ("Fund III Payment"). Included with that payment check was a handwritten note from Mr. Sharp, stating, "We finally got a decent payout on a promote! Please see yours enclosed." True and correct records of the Fund III Payment are attached hereto as **Exhibit I**.

52.     Unlike with the Fund I and Fund II Payments, HPI did not include with the Fund III Payment any statement of the value of the Fund III promote or any confirmation of the percentage of that promote being paid to Mr. Melling.

53.     Consistent with its general practice, HPI had not disclosed to the general public the value of its gross promote in Fund III.

54.     Because HPI held that information in confidence, Mr. Melling could not—and still cannot—verify that the Fund III Payment reflects the full amount he is owed.

55.     However, the real estate investment press did report certain information about the performance of Fund III.

56.     Using that public information, combined with personal knowledge of HPI's general practices acquired in the ordinary course of his employment with HPI, Mr. Melling calculated that the gross promote for Fund III was probably at least $9.7 million.

40960143.1

57.     Pursuant to Section 5 of the Settlement Agreement, Mr. Melling was entitled to a 10% share of the gross promote for Fund III, an amount that should have been nearly $1 million, based on the $9.7 million estimated gross promote—not the $398,461 Mr. Melling received in the Fund III Payment.

58.     On February 13, 2018, Mr. Melling emailed Mr. Sharp and asserted his doubts about whether the Fund III Payment reflected the full value of his 10% share of the Fund III gross promote.  Mr. Melling asked Mr. Sharp for a call or an email "to walk me through the accounting of how you arrived at my share."  A true and correct copy of this email and the related email thread is attached hereto as **Exhibit J**.

59.     On February 14, 2018, Mr. Sharp responded, stating, "I'm sorry you are disappointed with the amount, but it is correct."  Mr. Sharp also claimed that the computation of the Fund III Payment was extraordinarily complex, saying, "The calculation of the promote is done on an individual basis for over 1100 investments—it's literally 3,000 pages long and took our accountants three weeks to calculate."  *Id.*

60.     Mr. Sharp did not offer further information or agree to provide an accounting. Nor did Mr. Sharp offer any additional information about Fund III that would have allowed Mr. Melling to verify the amount of the Fund III Payment.  *Id.*

61.     On February 26, 2018, Mr. Melling responded to Mr. Sharp's email and identified the publicly available information on which Mr. Melling had based his estimate of the Fund III promote.  Mr. Melling also attached a spreadsheet detailing his information, assumptions, and computations.  Mr. Melling's February 26 email once again requested an accounting or a further meeting to discuss.  *Id.*

62.     Neither Mr. Sharp nor any other representative of HPI responded to Mr. Melling's February 26 email.

63.     After Mr. Melling's counsel sent a demand letter to HPI on March 20, 2018, HPI further obstructed, claiming with no basis through its counsel that the Settlement Agreement "does not grant Mr. Melling any rights to the gross promote of Fund III."  Instead, HPI claimed, the Settlement Agreement "simply reserves whatever rights he may have had—if any—in various funds at the time the separation agreement was executed."

64.     HPI's counsel further argued, again without any basis, that "[t]o the extent [Mr. Melling] may have had any rights in the gross promote of Fund III, these rights were contingent upon his continued employment with HPI and were cut off by his termination for nonperformance."

65.     Finally, HPI's counsel remarkably suggested that the $398,461 Fund III Payment—delivered some four years after HPI supposedly terminated Mr. Melling for cause—was a "discretionary bonus" that was not made pursuant to or in satisfaction of any obligation to Mr. Melling!

66.     In the face of HPI's willful disregard of the plain language of the Settlement Agreement, its reversal of its four-year course of dealing, and its continued denial of the existence of any legal obligation, Mr. Melling exercised his right to sue for enforcement of the compensation agreement pertaining to Fund III and the Settlement Agreement.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
BREACH OF CONTRACT

67.     The foregoing paragraphs are expressly incorporated by reference as if fully restated here.

68.     The Settlement Agreement expressly states that the release it contains "does not impair, affect, waive, or release: (i) Melling's interest in the following funds . . . HPI Real Estate Opportunity Fund III, LLC . . . (ii) Melling's carried interests in those funds as follows: . . . (z) HPI Real Estate Opportunity Fund III, LLLC [sic] – Melling is to be paid 10% of the gross promote paid to the Company."  *See* Exhibit D.

69.     That language is unambiguous and unconditional, and it memorializes an enforceable agreement and obligation for HPI to pay Mr. Melling, post-separation, 10% of the gross promote of Fund III.

70.     The Settlement Agreement is enforceable independent of any prior agreement between the parties.

71.     But to the extent more is required to demonstrate the parties' agreement, HPI's obligation to pay Mr. Melling 10% of the gross promote of Fund III is further evidenced by the term sheets and emails between Mr. Melling, Mr. Sharp, and Mr. Kelsey.  *See* Exhibits A-C.

72.     Those term sheets and emails, like the Settlement Agreement, are unambiguous and unconditional in granting Mr. Melling 10% of the gross promote of Fund III.

73.     Further, HPI demonstrated by its subsequent words and conduct that it understood that the Settlement Agreement required HPI to pay the stated percentages of the gross promotes of Funds I, II, and III.

74.     Mr. Melling has substantially performed all of his obligations under the Settlement Agreement.

75.     HPI has materially breached its obligation under the Settlement Agreement, and under the parties' prior written compensation agreements, to pay Mr. Melling 10% of the gross promote of Fund III.

14

76.     As a result of HPI's breach of its obligation under the Settlement Agreement, and under the parties' prior written compensation agreements, Mr. Melling has been damaged in an amount to be determined at trial, but in no event less than $500,000.00, plus his fees and costs incurred in his efforts to enforce his contractual rights.

<u>SECOND CAUSE OF ACTION</u>
BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

77.     The foregoing paragraphs are expressly incorporated by reference as if fully restated here.

78.     The Settlement Agreement, as well as the agreements leading up to the Settlement Agreement and HPI's course of performance pursuant to the Settlement Agreement, established a common purpose and gave Mr. Melling a justified expectation that HPI would honor its commitment to pay him 10% of the gross promote of Fund III.

79.     HPI has deviated from that common purpose and betrayed Mr. Melling's justified expectation by taking deliberate steps to injure Mr. Melling's right to receive the benefit of the parties' agreements.

80.     HPI has committed and propounded those breaches in bad faith.

81.     HPI's bad faith acts and omissions include:

a.      Failing and refusing to pay Mr. Melling 10% of the gross promote of Fund III;

b.      Failing and refusing to reveal the value of the Fund III gross promote;

c.      Failing and refusing to reveal the percentage of the Fund III gross promote being paid to Mr. Melling;

d.      Failing and refusing to provide an accounting sufficient to allow Mr. Melling to verify whether the Fund III Payment was "correct";

15

e.      Engaging in bad faith negotiations designed to delay and obstruct, including (i) denying the existence of known facts and documents until confronted with proof of their existence by Mr. Melling and his counsel; (ii) disclaiming the plain language and legal implications of the Settlement Agreement; and (iii) raising factual defenses contradicted by the entire course of dealing between the parties.

82.     HPI purposefully and repeatedly failed and refused to disclose information and acknowledge basic facts that Mr. Melling required to assess his contractual rights.

83.     HPI purposefully neglected and refused to fulfill its contractual obligation.

84.     HPI deliberately attempted to mislead Mr. Melling by obstructing his reasonable efforts to discover the factual basis for the payment that he received.

85.     As a result of HPI's breach of its implied covenant of good faith and fair dealing, Mr. Melling has been damaged in an amount to be determined at trial, but in no event less than $500,000.00, plus his fees and costs incurred in his efforts to enforce his contractual rights.

## THIRD CAUSE OF ACTION
### BREACH OF FIDUCIARY DUTY (ACCOUNTING)

86.     The foregoing paragraphs are expressly incorporated by reference as if fully restated here.

87.     HPI has fiduciary obligations to Mr. Melling by virtue of the relationship between the parties.

88.     In the compensation agreements between the parties, HPI agreed to make future payments to Mr. Melling of the specified percentages of the gross promote for each fund, including Fund III.

40960143.1

89.     Upon Mr. Melling's separation from HPI, the parties preserved Mr. Melling's right to those specified percentages of the gross promote and further memorialized HPI's obligation to make such future payments to Mr. Melling, including the Fund III Payment.

90.     Those future payments, including the Fund III Payment, were memorialized as percentages of future financial returns, "gross promotes," whose amounts HPI holds in confidence.

91.     Since Mr. Melling does not have access to this and other relevant information about the financial performance of HPI's funds, Mr. Melling is entirely reliant on HPI to police its own performance under the Settlement Agreement.

92.     This total reliance on HPI creates a relationship characterized by a unique degree of trust or confidence between the parties, where HPI has superior knowledge of and access to information necessary to calculate the amount owed to Mr. Melling under the parties' agreements.  This relationship creates a fiduciary duty flowing from HPI to Mr. Melling, giving rise to a right of accounting.

93.     That right of accounting also arises independently from the complexity of HPI's funds and the metrics used calculate fund performance and HPI's resulting obligations.

94.     While Mr. Melling is unable to verify HPI's performance independently, a combination of publicly available information and personal knowledge gives Mr. Melling strong and credible reason to believe that HPI has abused its fiduciary duty and breached its contractual obligation.

95.     Mr. Melling is entitled to an accounting sufficient to permit him to ascertain the true value of his contractual interest in Fund III and whether HPI has fully performed its obligations with respect to that interest.

96.     Mr. Melling, himself and through his counsel, has repeatedly asked HPI to provide such an accounting or equivalent remedy.

97.     HPI, itself and through its counsel, has ignored or refused each and every one of these requests.

98.     As a result, Mr. Melling is entitled to a judgment for an accounting sufficient to permit him to ascertain the true value of his contractual interest in Fund III and whether HPI has fully performed its obligations with respect to that interest.

FOURTH CAUSE OF ACTION
QUANTUM MERUIT

98.     The foregoing paragraphs are expressly incorporated by reference as if fully restated here.

99.     In the event that this Court determines that there is not an enforceable contract between Mr. Melling and HPI regarding his right to the 10% of the gross promote in connection with Fund III, Mr. Melling is nevertheless entitled to 10% of the gross promote under the doctrine of quantum meruit.

100.    Mr. Melling worked for HPI for four years to promote Funds I, II, and III, dedicating his time and energy to ensuring the success of HPI.

101.    In connection with his work on each of the three funds, Mr. Melling agreed with HPI as to a certain percentage of the gross promote.  That agreed upon percentage of the gross promote was then memorialized in the Settlement Agreement between Mr. Melling and HPI.

102.    For Funds I and II, Mr. Melling received the agreed upon percentage.  Mr. Melling justifiably expected to receive his agreed upon percentage for Fund III, as well.

103.    Now that a larger amount of money is at stake, however, HPI has attempted to unjustly enrich itself by unjustly denying Mr. Melling the 10% of the gross promote that he was repeatedly assured that he would receive.

104.    Mr. Melling rendered services to HPI in connection with all three funds, including Fund III.

      a.    During Mr. Melling's time at HPI, HPI raised more than $90 million in total equity, more than $20 million of which was raised from investors that Mr. Melling introduced to HPI.  The $20 million in equity that resulted from Mr. Melling's investor contacts generated more than $500,000 in acquisition fees (which Mr. Melling received no share of), more than $200,000 in ongoing asset management fees (which Mr. Melling received no share of), and more than $300,000 in ongoing annual property management fees (which Mr. Melling received no share of).

      b.    Mr. Melling leveraged his personal relationships and connections to bring large investors to HPI, and to provide additional bridge financing to help the funds close acquisitions.

105.    Mr. Melling is entitled to a reasonable sum for those services, and specifically is entitled to receive the 10% of the gross promote that was reasonably and justifiably expected by Mr. Melling.

## CONCLUSION

WHEREFORE, Plaintiff Christopher Melling demands judgment in his favor and against Hamilton Point Investments, LLC as follows:

1.    Awarding Mr. Melling damages in an amount to be determined at trial, but in no event less than $500,000;

40960143.1

2.  Awarding Mr. Melling an accounting of the actual value of his contractual interest in Fund III;

3.  Awarding Mr. Melling the value of his attorneys' fees and costs incurred in the pursuit of his rights under the Settlement Agreement;

4.  Prejudgment interest at the statutory rate from the time each applicable payment came due; and

5.  Such other and further relief as the Court deems just and proper.

Dated: New York, New York
      September 21, 2018

EVERSHEDS SUTHERLAND (US) LLP

BY: _____

Scott Greathead
Kara Ford
1114 Avenue of the Americas
New York, New York 10036
(212) 389-5000
scottgreathead@eversheds-sutherland.com
travismock@eversheds-sutherland.com

40960143.1

# EXHIBIT A

# HAMILTON POINT
### INVESTMENTS

## CHRISTOPHER MELLING
### Sr. Vice President, Capital Markets & Investments

### Key Responsibilities
1. Equity and debt placement
2. Sourcing, evaluation, underwriting, closing, financing of firm investments
3. As needed, asset management oversight of investments

### Compensation

*Fund I*
1. $5,000 per month for the months of May, June, July and August, increasing to 6,500 per month on September 1.
2. $25,000 one-time bonus at $10 million, $25,000 bonus at $15 million and $25,000 bonus at $20 million, cash.
3. 5-10 bps from Orchard Wholesaling fee ($9,000 to $18,000 at $20 million raise)
4. 2% of promote of Fund I (up to $200,000 over 3-year life of fund)

*Fund II*
1. Monthly cash comp increases to $7,500 at start of marketing, increasing to $9,000 after 3 months of marketing, and increasing to $10,000 per month after final close of Fund
2. Same bonus on cash raising ($25K at each of the three $5M hurdles)
3. Discretionary bonus of $50,000 after close of fund
4. Same wholesaling fee
5. 4% of promote of Fund II

### Start Date: May 1, 2010

7 VISTA DRIVE  OLD LYME CT  06371  (860) 598-4300

# HAMILTON POINT

INVESTMENTS

**CHRISTOPHER MELLING**
**Sr. Vice President, Capital Markets & Investments**

## Key Responsibilities

1. Equity and debt placement
2. Sourcing, evaluation, underwriting, closing, financing of firm investments
3. As needed, asset management oversight of investments

## Compensation

### Fund I

1. $5,000 per month for the months of May, June, July and August, increasing to 6,500 per month on September 1.
2. $25,000 one-time bonus at $10 million, $25,000 bonus at $15 million and $25,000 bonus at $20 million, cash.
3. 5-10 bps from Orchard Wholesaling fee ($9,000 to $18,000 at $20 million raise)
4. 2% of promote of Fund I (up to $200,000 over 3-year life of fund)

### Fund II

1. Monthly cash comp increases to $7,500 at start of marketing, increasing to $9,000 after 3 months of marketing, and increasing to $10,000 per month after final close of Fund
2. Same bonus on cash raising ($25K at each of the three $5M hurdles)
3. Discretionary bonus of $50,000 after close of fund
4. Same wholesaling fee
5. 4% of promote of Fund II

**Start Date:** May 1, 2010

7 VISTA DRIVE  OLD LYME CT  06371  (860) 598-4300

# HAMILTON POINT

### I N V E S T M E N T S

## CHRISTOPHER MELLING
### ~~Sr. Vice President, Capital Markets & Investments~~
### Principal

### Fund II Period Compensation, commenced November 2011

1. $10,000 per month
2. $250 per month car allowance
3. Reimbursed rent for NL apartment, commencing June 2012
4. 10% of gross promote of Fund II

_____          _____8/6/2012_____
Christopher Melling              Dated

_____          ____8.6.12_____
Matthew Sharp, Managing Principal   Dated
Hamilton Point Investments, LLC

2 Huntley Rd.  OLD LYME CT  06371  (860) 598-4300

# EXHIBIT B

 **Gmail**

**Chris Melling <chris.melling@gmail.com>**

## FW: Compensation
1 message

**Chris Melling** <melling@hamiltonptinv.com>                            Tue, Mar 25, 2014 at 10:41 AM
To: chris.melling@gmail.com

**From:** J. David Kelsey [mailto:kelsey@hamiltonptinv.com]
**Sent:** 07 June 2012 18:48
**To:** 'Chris Melling'; 'Matthew Sharp'
**Subject:** RE: Compensation

CM - the 10% is of the TOTAL GROSS promote, like in the calculation sheet. It is NOT net of any seed investors. DK

**From:** Chris Melling [mailto:melling@hamiltonptinv.com]
**Sent:** Thursday, June 07, 2012 4:09 PM
**To:** 'Matthew Sharp'; 'J. David Kelsey'
**Subject:** Compensation

Question – is my percentage of the promote as discussed calculated on the total Fund promote or your share of the Fund promote? I know you made some deal with the seed investors, so if the total promote owed to HPI in Fund I is say $2.0mm, and you owe $500,000 of that to seed investors. Is my 2% based on the $2.0mm of the $1.5mm?

If the latter, did you do a similar deal with anyone for Fund II? If the former, not relevant.

Thanks.

Chris Melling

Hamilton Point Investments

Principal

Main: 860-598-4300

Direct: 860-434-5166

Mobile: 646-382-8688

Email: melling@hamiltonptinv.com

# EXHIBIT C



Chris Melling <chris.melling@gmail.com>

## FW: Fund III

1 message

**Christopher Melling** <melling@hamiltonptinv.com>
To: chris.melling@gmail.com

Mon, Feb 3, 2014 at 9:17 AM

**From:** Matt Sharp [mailto:sharp@hamiltonptinv.com]
**Sent:** 01 February 2014 13:43
**To:** 'Christopher Melling'; 'J. David Kelsey'
**Subject:** RE: Fund III

Chris

It was same comp as now but with 10% of gross promote.

Matt

**From:** Christopher Melling [mailto:melling@hamiltonptinv.com]
**Sent:** Thursday, January 30, 2014 11:00 AM
**To:** 'Matt Sharp'; 'J. David Kelsey'
**Subject:** Fund III

Sometime today or tomorrow could you guys let me know what my compensation structure is for Fund III?

If I was told what it was I apologize but I can't remember.

Thanks.

# EXHIBIT D

## CONFIDENTIAL SETTLEMENT AGREEMENT AND GENERAL RELEASE

This Confidential Settlement Agreement and General Release ("Settlement Agreement") is made by and between **Christopher Melling** ("Melling"), and **Hamilton Point Investments, LLC**, 2 Huntley Rd., Old Lyme, CT 06371 (the "Company").

NOW THEREFORE, intending to be legally bound, the Company and Melling agree as follows:

1.    Termination of Independent Contractor Agreement.    Melling's last day of work for the Company was April 2, 2014, when the Company eliminated his position with the Company and terminated his Independent Contractor relationship with the Company (the "Termination Date"). Melling acknowledges that any role with or service to the Company or any of the other Releasees identified in Paragraph 5 below, and any authority he had to act on their behalf in any capacity, ended on the Termination Date.

2.    CONSIDERATION.    In consideration for Melling signing this Settlement Agreement, and in compliance with the promises made herein, the Company will:

   a.    Pay Melling the gross amount of Thirty Five Thousand Dollars ($35,000.00) (the "Settlement Proceeds") paid upon Melling's execution of this Settlement Agreement. The Company will include the Settlement Proceeds in the form 1099 it will issue to Melling for calendar year 2014; and

   b.    Pay Melling his car allowance of Two Hundred Fifty Dollars ($250) each month for the months of April and May 2014.

3.    TAX TREATMENT.   Melling agrees and understands that the Company makes no representations to Melling regarding the taxability of the payments set forth above, and that Melling remains fully responsible for any taxes, interest or penalties incurred by him due to the treatment of these payments by any taxing authority. Melling agrees that in the event any taxing authority determines any part of the Settlement Proceeds or other benefits is taxable income to Melling, he is solely responsible for the payment of all taxes, which may result to him by virtue of those payments, and that the Company shall not bear any responsibility for any tax liabilities of Melling. Melling shall hold harmless and indemnify the Company and any other Released Party described in Paragraph 5 in the event any taxing authority seeks payment of Melling's taxes, or interest, penalties, or other liabilities of Melling from the Company or any other Released Party. Melling also shall be responsible to hold harmless from, and indemnify the Company or any other Released Party for, any interest, penalty, attorney fees, or other cost or expense imposed on or incurred by any of them as a result of Melling not making any payment for income taxes, or other payment or contribution, which any state or federal taxing authority determines was required as a result of payment of the Settlement Proceeds or other benefits provided under this Agreement.

4.    NO CONSIDERATION ABSENT EXECUTION OF THIS AGREEMENT. Melling understands and agrees that he would not receive the consideration specified in

- 155413
100482779v2

paragraph (2) above, except for his execution of this Settlement Agreement and the fulfillment of the promises contained herein.

5.                    RELEASE.  (a) Melling Release.  For and in consideration of the payments to be made by the Company as set forth above and other good and valuable consideration, the sufficiency of which Melling acknowledges, Melling hereby releases and forever discharges the Company, and all of its direct or indirect, present and/or former parents, affiliates, divisions, subsidiaries, predecessors, successors, and assigns, including but not limited to, Hamilton Point Property Management, LLC, Hamilton Capital Investments, LLC, Milton Point Investments, LLC, and HPI Crocker House, LLC, as well as all of their present and former officers, directors, shareholders, members, founders, representatives, assigns, agents, counsel, insurers, reinsurers, fiduciaries, employee benefit plans, pension plans or funds, executors, administrators and employees (cumulatively, the "Company Releasees") to the fullest extent permitted by law, of and from all actions, causes of action, suits, debts, dues, sums of money, damages, judgments, executions, claims and demands which may be legally waived by private agreement, in law or in equity, known or unknown, foreseen or unforeseen, which he ever had, now has or which his heirs, executors, administrators, successors and assigns (cumulatively with Melling, the "Melling Releasors") hereafter shall, can or may have, upon or by reason of any matter, cause or thing whatsoever from the beginning of the world to the date of the mutual execution of this Settlement Agreement.  The foregoing release by the Melling Releasors includes, but is not limited to, any and all claims arising out of Melling's independent contractor relationship with the Company, the termination of that relationship, and any and all claims, individual or collective, arising on or before the parties' execution of this Settlement Agreement under the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 et seq., Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 et seq., the Civil Rights Act of 1871, as amended, 42 U.S.C. § 1981 et seq., the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 et seq., Family and Medical Leave Act, 29 U.S.C. §2601 et seq. and all other federal, state and local laws, including but not limited to, the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60,  and all other federal, state and local laws, as each of the foregoing have been or may be amended, and any and all claims arising under any other federal, state or local statute, law, rule, regulation, or decision, including without limitation, claims for discrimination, harassment, retaliation based on applying for workers compensation benefits, retaliation for any other act,  breach of contract, infliction of emotional distress, negligence, defamation or slander, and any and all other common law or tort claims, as well as any and all claims for attorneys' fees and costs.

The foregoing release does not waive claims Melling could make, if available, for unemployment compensation or workers' compensation benefits. Nor does it release claims the law does not permit Melling to release. The foregoing release also does not impair, affect, waive, or release: (i) Melling's interest in the following funds or his rights under the agreements covering those funds: HPI Apartment Opportunity Fund I, LLC, HPI Apartment Opportunity Fund II, LLC, and HPI Real Estate Opportunity Fund III, LLC (the "Funds"), (ii) Melling's carried interests in those funds as follows: (x) HPI Apartment Opportunity Fund I, LLC – Melling is to be paid 2% of the gross promote paid to the Company, (y) HPI Apartment Opportunity Fund II, LLC – Melling is to be paid 10% of the gross promote paid to the

Company, (z) HPI Real Estate Opportunity Fund III, LLLC – Melling is to be paid 10% of the gross promote paid to the Company, or (iii) any claims arising from or in connection with this Agreement.

(b)    Company Release.  For and in consideration of the Release by the Melling Releasors and other good and valuable consideration, the sufficiency of which the Company acknowledges, the Company hereby releases and forever discharges Melling, and all of his direct or indirect, present and/or former affiliates, executors, predecessors, heirs, administrators, successors, and assigns, representatives, agents, counsel, insurers, reinsurers and fiduciaries (cumulatively, the "Melling Releasees") to the fullest extent permitted by law, of and from all actions, causes of action, suits, debts, dues, sums of money, damages, judgments, executions, claims and demands which may be legally waived by private agreement, in law or in equity, known or unknown, foreseen or unforeseen, which it ever had, now has or which all of its direct or indirect, present and/or former parents, affiliates, divisions, subsidiaries, predecessors, successors, and assigns, including but not limited to, Hamilton Point Property Management, LLC, Hamilton Capital Investments, LLC, Milton Point Investments, LLC, and HPI Crocker House, LLC, as well as all of their present and former officers, directors, shareholders, members, founders, representatives, assigns, agents, counsel, insurers, reinsurers, fiduciaries, employee benefit plans, pension plans or funds,  executors, administrators and employees (cumulatively with Company, the "Company Releasors") hereafter shall, can or may have, upon or by reason of any matter, cause or thing whatsoever from the beginning of the world to the date of the mutual execution of this Settlement Agreement.  The foregoing release by Company Releasors includes, but is not limited to, any and all claims arising out of Company's independent contractor relationship with Melling, the termination of that relationship,  and any and all claims, individual or collective, arising on or before the parties' execution of this Settlement Agreement under the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 et seq., Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 et seq., the Civil Rights Act of 1871, as amended, 42 U.S.C. § 1981 et seq., the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., the Melling Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 et seq., Family and Medical Leave Act, 29 U.S.C. §2601 et seq. and all other federal, state and local laws, including but not limited to, the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60,  and all other federal, state and local laws, as each of the foregoing have been or may be amended, and any and all claims arising under any other federal, state or local statute, law, rule, regulation, or decision, including without limitation, claims for discrimination, harassment, retaliation based on applying for workers compensation benefits, retaliation for any other act,  breach of contract, infliction of emotional distress, negligence, defamation or slander, and any and all other common law or tort claims, as well as any and all claims for attorneys' fees and costs.  The foregoing release does not waive claims the Company may have against Melling or the other Melling Releasors arising out of willful misconduct or criminal behavior by Melling or any of the other Melling Releasors. The Company acknowledges that it is aware of no such conduct or behavior as of the execution of this agreement.

6.    NO CLAIMS FILED.  Melling represents that he has not filed any claims, complaints, charges or other proceedings against the Company or any of the Releasees in any court, administrative agency, or other forum relating directly or indirectly to his work for the

Company or any of the other Company Releasees, his independent contractor relationship with the Company, or the termination of that relationship. Melling understands that nothing in this Agreement shall be construed to prohibit him from filing a charge with, or participating in any investigation or proceeding conducted by, the Equal Employment Opportunity Commission, National Labor Relations Board ("NLRB"), the Connecticut Commission on Human Rights and Opportunities and/or any federal, state or local agency. Notwithstanding the foregoing, Melling hereby waives any and all rights to recover any relief, including but not limited to, monetary damages, reinstatement, or any other relief in any charge, complaint or lawsuit filed by him or by anyone else on his behalf, except with the NLRB or anywhere else such a waiver is prohibited.

7.    NONADMISSION OF WRONGDOING.    By entering into this Settlement Agreement, none of the Melling Releasees or Company Releasees admits any liability, wrongdoing or violation of any law, statute, regulation, agreement, or policy.

8.    REPRESENTATIONS.    Melling represents and acknowledges the following: (1) he has received all compensation due him as a result of the services he performed for the Company and any of the other Company Releasees to the date of his signature on this Settlement Agreement, and that none of the Company Releasees owes him any wages, commissions, bonuses, sick pay, disability leave pay, family leave pay, severance pay, vacation pay, paid time off; or any other compensation, benefit, payment or remuneration of any kind or nature, except for vested benefits under any ERISA plan to which he may be entitled, (2) he has reported to the Company any and all work-related injuries incurred by him; and (3) he is aware of no concerns regarding suspected ethical and compliance issues or violations on the part of the Company or any of the other Company Releasees.

9.    CONFIDENTIALITY.    Melling agrees and acknowledges that he has not disclosed and shall not disclose the existence or terms and conditions of this Settlement Agreement to anyone other than his spouse, private counsel, and tax advisor, and that he may make only such other disclosures as are expressly required by law. Melling may only advise his spouse, private counsel, and tax advisor of the terms of the Settlement Agreement after they have agreed to keep said terms confidential and not to disclose them. Company agrees and acknowledges that J. David Kelsey, Matthew Sharp and any other employee, agent, contractor or representative who has knowledge of this Agreement's terms have not disclosed and shall not disclose the existence or terms and conditions of this Settlement Agreement to anyone other than the Company's  counsel and tax advisor, and that it may make only such other disclosures as are expressly required by law. J. David Kelsey, Matthew Sharp and any other employee, agent, contractor or representative who has knowledge of this Agreement's terms  may only advise the Company's counsel, and tax advisor of the terms of the Settlement Agreement after they have agreed to keep said terms confidential and not to disclose them.

10.    NON-DISPARAGEMENT.

a.                          Melling agrees that for the period of five (5) years from the date of his execution of this Agreement: (i) he will not utter or issue any oral or written statement or communication that disparages any of the Company Releasees; and (ii) he will not in any way participate in, assist or facilitate disparagement of any of the Company Releasees by

any third party, except if testifying truthfully under oath pursuant to subpoena or other legal process or otherwise responding to or providing disclosures required by law in connection with an investigation by a governmental or law enforcement agency. In the event Melling is compelled by subpoena process to testify as described herein, Melling will provide prompt written notice to the Company (on behalf of any of the Company Releasees) as soon as possible and prior to responding to such subpoena, in time to permit the Company Releasees to take any action they may deem appropriate to protect their rights under this Agreement. Melling expressly represents that he has complied with this provision of the Agreement from April 2, 2014, through the date on which he has executed this Agreement. Melling further acknowledges that the Company has relied on this representation in entering into this Agreement, and will rely on his continued compliance with this provision of the Agreement in complying with the Company's obligations under this Agreement.

    b.    The Company agrees that for the period of five (5) years from the date of its execution of this Agreement: (i) J. David Kelsey and Matthew Sharp will not utter or issue any oral or written statement or communication that disparages Melling; and (ii) J. David Kelsey and Matthew Sharp will not in any way participate in, assist or facilitate disparagement of Melling by any third party, except if testifying truthfully under oath pursuant to subpoena or other legal process or otherwise responding to or providing disclosures required by law in connection with an investigation by a governmental or law enforcement agency. In the event that J. David Kelsey or Matthew Sharp is compelled by subpoena process to testify as described herein, the Company will provide prompt written notice to Melling as soon as possible and prior to responding to such subpoena, in time to permit Melling to take any action he may deem appropriate to protect their rights under this Agreement. The Company expressly represents that J. David Kelsey and Matthew Sharp have complied with this provision of the Agreement from April 2, 2014, through the date on which The Company executed this Agreement. The Company further acknowledges that Melling has relied on this representation in entering into this Agreement, and will rely on continued compliance with this provision of the Agreement in complying with his obligations under this Agreement.

    11.  <u>COOPERATION</u>. Melling agrees that he will be available, upon reasonable notice, to respond to questions and provide assistance to the Company or any other Released Party regarding: a) any complaint, claim, investigation, charge or similar matter relating to, or arising out of, any act or omission on his part; and b) any matter for which he was responsible; c) or any matter about which he had knowledge in connection with his work for any of the Released Parties. Melling further agrees to fully cooperate in any litigation, administrative proceeding, or other proceeding that may involve him in any capacity as a result of his work for the Company or any other Released Party, or concerning which he has knowledge in connection with his work for the Company or any of the other Company Releasees . This includes, if necessary, meeting at mutually convenient times with the Company's attorneys, attending meetings, depositions and trial, and providing truthful testimony. Melling understands that the Company shall provide reimbursement for reasonable documented costs and expenses of such cooperation, including travel expenses, incurred in any calendar year in connection with cooperation required under this paragraph.



    12.  <u>THIRD PARTY INQUIRIES</u>. Melling understands that in response to third party requests, the Company complies with its existing policy by verifying only dates of employment

or service, last position held and, if authorized, compensation information. Melling further understands that the Company is obligated to produce information and records in response to lawful requests from government agencies and in connection with litigation and regulatory proceedings.

13.    NO FUTURE APPLICATION FOR EMPLOYMENT.  Melling will not apply in the future for employment with the Company or any of the other Company Releasees, and hereby agrees that the execution of this Settlement Agreement is good and sufficient cause for the Company or any of the other Company Releasees to reject any such application for employment.

14.    NON-USE AND NON-DISCLOSURE OF CONFIDENTIAL INFORMATION. Melling acknowledges and agrees that in the course of his work for the Company he has been provided with access to confidential information of the Company and the other Company Releasees, including but not limited to technology, personnel records, wage information, know-how, trade secrets, products, customer information, lists and data, marketing and business plans and strategies, product development, pricing and other processes and methods, and financial and other business data regarding the Company and the other Company Releasees and their clients and investors and/or information the nature of which would commonly be reasonably understood to be confidential (hereinafter referred to collectively as the "Confidential Information").  In addition to his common law obligation to do so, Melling specifically agrees to keep such information strictly confidential, and not to directly or indirectly use, disclose, reproduce, sell, retain, remove from the premises, make available to any other person or entity, or use for Melling's own or for any other person's or entity's benefit, any portion of the Confidential Information, without the prior written consent of the Company or as may be required by law.



15.    RETURN OF COMPANY PROPERTY.  Melling represents that he has returned to the Company any and all property in his possession, custody or control that belongs to the Company (such property includes without limitation, equipment, credit cards, keys, files, and other documents, computer disks, codes and any other computer or electronic information, including, but not limited to, the confidential information described in paragraph 14.  Melling also represents that he has no Company information on his personal computer systems.

16.    ENTIRE AGREEMENT.   This Settlement Agreement represents the entire agreement between the parties hereto and supersedes all prior agreements or understandings, written or oral, between the parties, except those governing the Funds referenced in Paragraph 5. This Settlement Agreement may not be changed except by an instrument in writing signed by the parties.  Melling acknowledges that he has not relied on any representations, promises, or agreements of any kind made to him in connection with his decision to sign this Settlement Agreement and that he executes this Settlement Agreement freely and voluntarily.

17.    GOVERNING LAW AND INTERPRETATION.  This Settlement Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Connecticut, without giving effect to principles of conflicts of law.  Should any provision of this Settlement Agreement other than Paragraph 5 be declared illegal or unenforceable by any court of competent jurisdiction and cannot be modified to be enforceable, such provision shall immediately become null and void, leaving the remainder of this Settlement Agreement in full

6

force and effect.  If the release of claims in Paragraph 5 is declared illegal or unenforceable by any court of competent jurisdiction and cannot be modified to be enforceable, then Melling will reimburse the Company the sums paid to him pursuant to Paragraph 2.

18.    ATTORNEY FEES AND COSTS.  In the event any action, suit or proceeding is brought to interpret, enforce or obtain relief from a breach of this Agreement, the prevailing party shall recover all such party's reasonable costs, expenses and attorneys' fees incurred in each and every such action, suit or other proceeding, including any and all appeals or petitions therefrom.

IN WITNESS WHEREOF, the parties have executed this Settlement Agreement as of the dates set forth below.

Date:  5/28/2014

Christopher Melling

Hamilton Point Investments, LLC

Date:  6.2.14

By:

Its    Member

7

# EXHIBIT E

| | |
|---|---|
| **From:** | Chris Melling |
| **To:** | Ford, Kara; Greathead, Scott |
| **Subject:** | email |
| **Date:** | Thursday, September 13, 2018 10:35:03 AM |

From: "J. David Kelsey" <kelsey@hamiltonptinv.com <mailto:kelsey@hamiltonptinv.com> >
Date: May 15, 2014 at 5:12:36 PM EDT
To: "'Chris Melling'" <chris.melling@gmail.com <mailto:chris.melling@gmail.com> >
Cc: <sharp@hamiltonptinv.com <mailto:sharp@hamiltonptinv.com> >
Subject: Agreement

Chris - attached is the agreement we are prepared to sign, a clean and blacklined version comparing your changes to this final with all economic and legal comments.  The two material items we did not agree to are:

1)  inclusion of your two economic items for any Crocker House DST and an upward adjustment to Garden Park fee.  We did not discuss a fee for any Crocker House exchange deal whether you were part of the efforts or not.  On the Garden Park fee, we talked about hiring an acquisitions person to free up Matt and me after hiring Kristin to free you up, funded by a portion of the full Garden Park fee.  We did not hire an acquisitions associate, but we did hire Cinami to oversee capital projects as well as bringing Ashley on payroll to help Melissa.  The effect was the same, a portion of the GP acquisition fee for ALL of us went to fund MORE hiring than we actually planned in order to free Matt and me.

2)  exclusion of the cooperation provision for anything you might have been involved in that might crop up later.

On the $10,000 from 2012, that advance was made April 13, 2012 and was not included in the 2012 1099 you received, so we did not expense it on our side and you likely did not declare it as income that year.  Bart recalled it as a loan for 2011 taxes, and had it as a receiveable to be repaid from proceeds of any promote fees to you.  If you don't recall this at all, we are willing to just 1099 that income to you and expense it on our side, which ever you want, Bart can handle it.

What we are prepared to do is pay you $20,500 when the agreement is signed, memorialize without alteration what we concretely agreed on your promote share, ensure mutual non-disparagement, and mutually release each other.

Dave

J. David Kelsey, Managing Principal

Hamilton Point Investments LLC

2 Huntley Rd.

Old Lyme, CT  06371

(860) 598-4301

# EXHIBIT F

HAMILTON POINT INVESTMENTS LLC

Christopher Melling

1821

| Date | Type | Reference | | Original Amt. | Balance Due | 6/2/2014 Discount | Payment |
|------|------|-----------|---|---------------|-------------|-------------------|---------|
| 6/2/2014 | Bill | | | 35,500.00 | 35,500.00 | | 35,500.00 |
| | | | | | | Check Amount | 35,500.00 |

Bank of America                                                                                      35,500.00

# EXHIBIT G

# HAMILTON POINT

INVESTMENTS

June 22, 2015

*Via US Mail*

Mr. Chris Melling
9 College Place, Apt. 2A
Brooklyn, NY 11201

Dear Chris,

Enclosed please find a check representing 2% of the total "promote" owed to Hamilton Point Investments from HPI Apartment Opportunity Fund I, LLC. The gross promotable amount was $681,687 and the 20% promote was $136,337. The enclosed check represents 2% of that.

Thank you.

Bart Giustina
Chief Financial Officer

2 Huntley Road, Old Lyme, CT 06371 · Tel (860) 598-4300

HAMILTON POINT INVESTMENTS LLC                                    2217

Christopher Melling                                  6/22/2015

| Date | Type | Reference | Original Amt. | Balance Due | Discount | Payment |
|------|------|-----------|---------------|-------------|----------|---------|
| 6/22/2015 | Bill | Promote | 2,726.74 | 2,726.74 | | 2,726.74 |

Check Amount                2,726.74

Bank of America                                                2,726.74

EXHIBIT H

## HPI Apartment Opportunity Fund II LLC                C. Melling - Incentive Fee Participation

| | |
|---|---|
| Fund II Incentive Fee to HPI | $ 428,384.00 |
| Participation | 10.00% |
| Participation Amount | $  42,838.40 |

# EXHIBIT I

# HAMILTON POINT
INVESTMENTS

**MATTHEW A. SHARP**, *Managing Principal*

Chris —

I hope you are well.

We finally got a decent payout

on a private.

Please see yours enclosed.

All the best.

Matt

ORIGINAL DOCUMENT PRINTED ON CHEMICAL REACTIVE PAPER WITH MICROPRINTED BORDER

**HAMILTON POINT INVESTMENTS LLC**
2 HUNTLEY ROAD
OLD LYME, CT 06371

KEY BANK
CLEVELAND, OHIO

3750

6-103/410

2/5/2018

PAY TO THE
ORDER OF    Christopher Melling

$ **398,461.00

Three Hundred Ninety-Eight Thousand Four Hundred Sixty-One and 00/100******************************************** DOLLARS

Christopher Melling
9 College Place, Apt 2A
Brooklyn Heights, NY 11201

MEMO

AUTHORIZED SIGNATURE

THIS DOCUMENT CONTAINS HEAT SENSITIVE INK. TOUCH OR PRESS HERE - RED IMAGE DISAPPEARS WITH HEAT

⑈003750⑈ ⑆041001039⑆ 359681463915⑈

HAMILTON POINT INVESTMENTS LLC

3750

Christopher Melling

2/5/2018

| Date | Type | Reference | Original Amt. | Balance Due | Discount | Payment |
|------|------|-----------|---------------|-------------|----------|---------|
| 2/5/2018 | Bill | | 398,461.00 | 398,461.00 | | 398,461.00 |
| | | | | | Check Amount | 398,461.00 |

Key Bank

398,461.00

# EXHIBIT J

 **Gmail**

Chris Melling <chris.melling@gmail.com>

---

## Re: Fund III

1 message

---

**Chris Melling** <chris.melling@gmail.com>                                              Mon, Feb 26, 2018 at 3:23 PM
To: Matt Sharp <sharp@hamiltonptinv.com>

Matt,

To be clear, my email was not intended to convey "disappointment", but rather I'm trying to understand that methodology behind the check amount better.

I read here on the link below the total size of Fund III was $80mm

https://www.thefreelibrary.com/Fund+wraps+up+with+%2441m+apartment+purchase%3A+Hamilton+Point...-a0415324520

I used the numbers from the DI Wire article that I sent earlier to create a simulated approximation just using the averages and some assumptions - a 13% total load on equity, $205mm of properties purchased, a 5% purchase cost added on to give an estimated acquisition LTV of 71%

Using the $278mm total sales figure from the article, I assumed 6% selling fees & costs to account for brokers and defeasance and or pre-payment penalties and a 69% LTV on average for closings   I assumed the 8% distribution was paid during the fund life as was done in past funds and averaged that over the reported 3.5 year average fund life. I then added the waterfall and attempted to get to the average net return reported.

Using this basic model, it generates an approximate gross promote of $9.7mm - my prior email was seeking to reconcile the delta.

In the past you had provided me with an accounting when sending promote payments, but nothing came with this check. While I don't expect a 3,000 page report and I understand there are many investors each with a unique calculation, any calculation support would be helpful in reconciling with the model I ran.

I've attached my model so you can see what I'm trying to do.

Could you kindly send me some backup to how my share was calculated and let me know if I'm missing something in my math?  Happy to talk directly with you or your accountants if you think that's helpful.

Thanks,

Chris

On Wed, Feb 14, 2018 at 3:43 PM, Matt Sharp <sharp@hamiltonptinv.com> wrote:

> HI, Chris.
>
> I'm sorry you are disappointed with the amount, but it is correct.  Not sure what figure you are coming up with from the press release.  The calculation of the promote is done on an individual basis for over 1100 investments – it's literally 3,000 pages long and took our accountants three weeks to calculate.

Matt

**From:** Chris Melling [mailto:chris.melling@gmail.com]
**Sent:** Tuesday, February 13, 2018 11:21 AM
**To:** Matthew Sharp <sharp@hamiltonptinv.com>
**Subject:** Fund III

Dear Matt,

I received the check and your note.  I hope that you and Eliza and the girls are all doing well.  Congratulations on another successful full cycle fund and all your continued success at Hamilton Point.

I saw the DI Wire article below regarding the final returns to Fund III investors.

https://thediwire.com/hamilton-point-fund-goes-full-cycle-3-5-years-nets-18-irr-investors/

Based on the returns in this article, from my perspective, it does not appear the check reflects full payment.   Using a quick back of the envelope calculation, it would seem that 10% of the gross promote is greater than the amount in the check I received.

I would like to set up a call to walk me through the accounting of how you arrived at my share. Alternatively if you want to email me an accounting for review that works too.  Just trying to understand the math a bit better.

Look forward to hearing from you.  Thanks.

Sincerely,

Case 1:18-cv-03514-ARR-SMG    Document 20    Filed 09/21/18    Page 54 of 55 PageID #: 163

Chris Melling

 **HPI Fund 3 BOTE.xlsx**
13K

| HPI Real Estate Opportunity Fund III BOTE | | |
|---|---|---|
| Total Equity Raised Reported | | $ 80,000,000.00 |
| Average Fund Life Reported | | 3.5 years |
| Total Purchase Price Reported | | $ 205,000,000.00 |
| Total Disposition Price Reported | | $ 278,000,000.00 |
| Average Net IRR Reported | | 18.23% |
| Average Equity Multiple Reported | | 1.66x |

| Acquisition | | |
|---|---|---|
| Estimated Load on Equity | 13% | $ 10,400,000.00 |
| Estimated Equity Available to Invest | | $ 69,600,000.00 |
| Total Purchase Price Reported | | $ 205,000,000.00 |
| Estimated Purchase Fees & Costs | 5% | $ 10,250,000.00 |
| Estimated Gross Purchase Price | | $ 215,250,000.00 |
| Estimated Total Acquisition Debt | | $ 145,650,000.00 |
| Estimated Loan to Value at Acquisition | | 71.05% |

| Disposition | | |
|---|---|---|
| Estimated Selling Fees & Costs | 6% | $ 16,680,000.00 |
| Estimated Loan to Value % Total Debt at Close | 69% | $ 141,450,000.00 |
| Total Disposition Price Reported | | $ 278,000,000.00 |
| Estimated Gross Equity on Sale | | $ 119,870,000.00 |
| Estimated Gross Equity Multiple | | 1.50x |
| Estimated Gross Profit on Sale | | $ 39,870,000.00 |
| | | |
| Estimated Distributions Annual | 8% | $ 6,400,000.00 |
| Estimated Distributions over average fund life | 3.5 | $ 22,400,000.00 |
| Estimated Distribution Multiple | | 0.28x |
| | | |
| Estimated Gross Equity Multiple: Sales + Distributions | | 1.78x |
| Estimated Gross Profit: Sales + Distributions | | $ 62,270,000.00 |

| First Hurdle Rate | 8% | |
|---|---|---|
| Annual Return to get to 8% | | $ 6,400,000.00 |
| Average Fund Life | 3.5 | |
| Total Return to get to 8% Pref | | $ 22,400,000.00 |
| | | |
| Second Hurdle Rate | 16% | |
| Annual Return to get to 16% | | $ 12,800,000.00 |
| Average Fund Life | 3.5 | |
| Total Return to Get to 16% Pref | | $ 44,800,000.00 |
| | | |
| Subject to 20% Promote | | $ 22,400,000.00 |
| 20% Promote Estimated | | $ 4,480,000.00 |
| Subject to 30% Promote | | $ 17,470,000.00 |
| 30% Promote Estimated | | $ 5,241,000.00 |
| Estimated Total promote | | $ 9,721,000.00 |

| Estimated Gross Equity Minus Promote | | $ 52,549,000.00 |
|---|---|---|
| Estimated Invested Equity Plus Net Return | | $ 132,549,000.00 |
| Total Equity Raised in Fund - Reported | | $ 80,000,000.00 |
| Net Equity Multiple Reported | | 1.66x |