UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Christopher Melling, | 1:18-CV-3514 (ARR) (SMG) |
| *Plaintiff*, | |
| – against – | |
| Hamilton Point Investments, LLC, | |
| *Defendant.* | **Opinion & Order** |

ROSS, United States District Judge:

In this diversity action, the plaintiff is seeking a payment from the defendant, his former employer, that the plaintiff claims he is contractually owed. A complication is that the plaintiff doesn't actually know how large the payment ought to be. The Connecticut-based defendant acknowledges the contract dispute, but argues that this court has no jurisdiction over it, and that two of the plaintiff's causes of action fail to state a claim. For the reasons that follow, I deny the defendant's motion.

## BACKGROUND

In May 2010, the plaintiff, a resident of Brooklyn, New York, was hired by the defendant, HPI, a Delaware limited liability company with its principal place of business in Connecticut. *See* Am. Compl. ¶¶ 10–11, 22, ECF No. 20; Sharp Decl. ¶¶ 2, 5, ECF No. 27-2; Melling Decl. ¶ 3, ECF No. 27-9. The defendant is a real-estate private-equity investment company, and the plaintiff was hired to help the defendant raise capital for its various investment funds. *See* Am. Compl. ¶¶ 16, 22; Sharp Decl. ¶¶ 3, 6; Melling Decl. ¶¶ 5–6. The plaintiff harbored no intention to move to Connecticut, however. Melling Decl. ¶ 11. Although he rented an apartment near the defendant's offices, he worked in Connecticut only

1

about half the time; the other half he worked from home, in New York. *See* Am. Compl. ¶¶ 34, 35(d); Melling Decl. ¶¶ 16, 19.

The parties dispute whether that arrangement was ever agreed to. The plaintiff claims that both parties understood that the plaintiff would be splitting his time between New York and Connecticut. *See* Am. Compl. ¶ 35; Melling Decl. ¶¶ 12, 14. The defendant asserts that the plaintiff was expected to work from Connecticut, except when he was traveling on business. Sharp Decl. ¶¶ 9–10. The defendant says that ultimately this disagreement "directly led to [the plaintiff's] termination." *Id.* ¶ 10.

The plaintiff's work included helping to raise capital for three particular investment funds launched by the defendant, which the parties denominate as Fund I, Fund II, and Fund III. *See* Am. Compl. ¶¶ 29, 37–39; Sharp Decl. ¶ 6; Melling Decl. ¶ 5. Part of the plaintiff's compensation was tied to the investment performance of these funds. *See* Am. Compl. ¶¶ 30–33 & Exs. A, C.

The plaintiff's complaint alleges that he was hired "in part to take advantage of his contacts with investors in New York." Am. Compl. ¶ 22. The defendant disputes that. *See* Sharp Decl. ¶ 6 ("He was not tasked with focusing on New York investors specifically and was not hired to take advantage of his New York contacts."); *cf.* Melling Decl. ¶ 9 ("[A]lthough I did not exclusively target investors in New York, I did meet and communicate with potential New York resident investors and promote the fund to them in New York."). Whatever the case, New York residents did invest in the defendant's funds, and contributed 5.5% of the total investment in Fund III. *See* Am. Compl. ¶ 20; Sharp Decl. ¶ 4; Melling Decl. ¶ 9.

In early 2014, the plaintiff's employment was terminated. *See* Am. Compl. ¶ 40; Sharp Decl. ¶ 11. In connection with that termination, the parties entered into a settlement agreement, mutually releasing each other from any claims that each might have against the

other. Am. Compl. ¶ 41; *see id.* Ex. D. The agreement specifically carved out, however, the plaintiff's preexisting rights to compensation based on the performance of the three funds, memorializing that "Melling [was] to be paid 2% of the gross promote paid to the Company" with respect to Fund I, "10% of the gross promote paid to the Company" with respect to Fund II, and "10% of the gross promote paid to the Company" with respect to Fund III. Am. Compl. Ex. D, at 2–3; *accord* Am. Compl. ¶¶ 45–46.[1] These percentages had been previously agreed to by the parties during the course of the plaintiff's employment. *See* Am. Compl. ¶¶ 30, 32–33 & Exs. A–C.

In June 2015, the plaintiff received his Fund I-related compensation. Am. Compl. ¶ 50(b). Accompanying the payment was a typed letter from the chief financial officer of the defendant stating that, as to Fund I, "[t]he gross promotable amount was $681,687 and the 20% promote was $136,337. The enclosed check represents 2% of that." *Id.* Ex. G.[2] Similarly, in June 2016, the plaintiff received his Fund II-related compensation, which was accompanied by a typed statement that recited that the "Fund II Incentive Fee to HPI" was $428,384.00 and the 10% "Participation Amount," which the plaintiff received, was $42,838.40. Am. Compl. ¶ 50(c) & Ex. H. The plaintiff considers these payments to have satisfied the defendant's obligations toward him with respect to Funds I and II. *See* Am. Compl. ¶ 50.

Finally, in February 2018, the plaintiff received a check for $398,461. Am. Compl. ¶ 51. Accompanying the check was a handwritten note from Matthew Sharp, one of the defendant's members, which said: "We finally got a decent payout on a promote! Please see yours enclosed." *Id.*; *see id.* Ex. I. Although he lacked the confidential information necessary to

---

[1] The plaintiff explains that "'promote' or 'carried interest' is the amount the sponsor of a real estate investment fund earns once the fund reaches a certain threshold of profits." Pl.'s Opp'n 4–5, ECF No. 27-8; *see also* Def.'s Br. 6 n.2, ECF No. 27-1 ("'Gross promote' is an industry term for the total amount of profit above a predetermined threshold earned by the sponsor of a real estate private equity deal.").
[2] The check was for $2726.74, which is 2% of $136,337. *See* Am. Compl. Ex. G.

3

calculate the "gross promote," the plaintiff came to believe, based on publicly reported information about Fund III, that he ought rather to have been paid "nearly $1 million" in connection with that fund. Am. Compl. ¶¶ 53–57. The plaintiff raised his concerns with Sharp, who responded simply that the amount was "correct," without offering proof. *Id.* ¶¶ 58–59; *see id.* Ex. J, at 1. Subsequent attempts by the plaintiff and his counsel to obtain an accounting from the defendant were fruitless. *See* Am. Compl. ¶¶ 61–66.

The plaintiff has sued, alleging a breach of contract, a breach of the implied covenant of good faith and fair dealing, and a breach of fiduciary duty. *Id.* ¶¶ 66–98. The plaintiff is suing both for his full compensation in connection with Fund III as well as to discover how much that compensation ought to be. *See id.*

The defendant has now moved to dismiss the complaint for lack of personal jurisdiction and for failure to state a claim with respect to the good-faith-and-fair-dealing and fiduciary-duty causes of action. *See* Def.'s Br. 2–3, ECF No. 27-1.

## DISCUSSION

The defendant's motion, claiming both lack of personal jurisdiction and failure to state a claim, is made under Rule 12(b)(2) and (6). *See* Fed. R. Civ. P. 12(b).

Because "a 12(b)(2) motion is 'inherently a matter requiring the resolution of factual issues outside of the pleadings,'" on the question of personal jurisdiction, I "may rely on additional materials extrinsic to the complaint." *Minnie Rose LLC v. Yu*, 169 F. Supp. 3d 504, 508 n.1 (S.D.N.Y. 2016) (quoting *John Hancock Prop. & Cas. Ins. Co. v. Universale Reinsurance Co.*, No. 91 CIV. 3644 (CES), 1992 WL 26765, at *1 n.1 (S.D.N.Y. Feb. 5, 1992)). "The plaintiff bears the burden of establishing personal jurisdiction over the defendant . . . , [but] when a motion to dismiss for lack of jurisdiction is decided on the basis of affidavits and other written materials, the plaintiff need only make a prima facie showing." *Seetransport Wiking Trader*

*Schiffarhtsgesellschaft MBH & Co. v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993) (quoting *Taylor v. Phelan*, 912 F.2d 429, 431 (10th Cir. 1990)). As such, I assume the truth of "[t]he allegations in the complaint . . . to the extent they are uncontroverted by the defendant's affidavits. If the parties present conflicting affidavits, all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party." *Id.* (quoting *Taylor*, 912 F.2d at 431).

"On a motion to dismiss pursuant to Rule 12(b)(6), however, the court relies on and accepts as true the allegations in the Complaint[ but] . . . may not rely on documents outside the pleadings . . . ." *Minnie Rose*, 169 F. Supp. 3d at 508 n.1 (citation omitted). I thus consider the parties' declarations "when considering the 12(b)(2) motion but not [when considering] the 12(b)(6) motion." *Id.* On the purported failure to state a claim, I simply "assess whether the complaint 'contain[s] sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."'" *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 119 (2d Cir. 2013) (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## I. Personal Jurisdiction

"A district court must have a statutory basis for exercising personal jurisdiction" over a defendant. *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 128 (2d Cir. 2013). The propriety of the exercise of "personal jurisdiction is determined by the law of the state in which the court is located." *Spiegel v. Schulmann*, 604 F.3d 72, 76 (2d Cir. 2010).[3] Here, the plaintiff asserts that I have jurisdiction over the defendant under section 302(a)(1) of the New York Civil Practice Law and Rules, which provides that "a court may exercise personal jurisdiction over any non-

---

[3] The court's exercise of personal jurisdiction must also be "consistent with federal due process requirements." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999). That relatively low bar is met here, and the defendant does not argue otherwise.

domiciliary . . . who in person or through an agent . . . transacts any business within the state." *See* Am. Compl. ¶ 13.

"[F]or section 302(a)(1) to apply, 'it is essential . . . that there be some act by which the defendant purposefully avails [itself] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Marvel Characters*, 726 F.3d at 128 (quoting *Beacon Enters., Inc. v. Menzies*, 715 F.2d 757, 766 (2d Cir. 1983)). "As relevant here, purposeful availment occurs when the non-domiciliary 'seeks out and initiates contact with New York, solicits business in New York, and establishes a continuing relationship.'" *D & R Global Selections, S.L. v. Bodega Olegario Falcon Pineiro*, 78 N.E.3d 1172, 1176 (N.Y. 2017) (quoting *Paterno v. Laser Spine Inst.*, 23 N.E.3d 988, 993 (N.Y. 2014)).

Yet "[i]t is not enough that a non-domiciliary defendant transact business in New York." *Id.* "In addition, the plaintiff's cause of action must have an 'articulable nexus' or 'substantial relationship' with the defendant's transaction of business here." *Id.* (citing *Licci v. Lebanese Canadian Bank*, 984 N.E.2d 893, 900 (N.Y. 2012)). "This inquiry is 'relatively permissive,'" however—there need only be "a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former." *Id.* (quoting *Licci*, 984 N.E.2d at 900).

The plaintiff has alleged that the defendant has transacted business within the State of New York. *See, e.g.*, Am. Compl. ¶ 39 (alleging that plaintiff and defendant's members attended meetings with investors in New York); Melling Decl. ¶ 9 (declaring that plaintiff met with New York-resident investors in New York on defendant's behalf); *see also* Sharp Decl. ¶ 4 (acknowledging that New York residents made up 5.5% of investment in Fund III). What the parties dispute is whether the plaintiff's claims arise from the defendant's business in New York—that is, whether an "articulable nexus" or "substantial relationship" exists. *See* Def.'s

6

Br. 3 ("[A]ny business transactions HPI may have had in New York . . . do not give rise to Plaintiff's contractual claims in any way.").

Answering that question requires delineating what the plaintiff's claims actually are and whence they come. At bottom, the plaintiff is aggrieved because he believes that he was not fully compensated for his work for the defendant on Fund III. *See* Am. Compl. ¶ 75 ("HPI has materially breached its obligation . . . to pay Mr. Melling 10% of the gross promote of Fund III."). According to the complaint, the plaintiff and the defendant negotiated and agreed, at some point before February 1, 2014, that the plaintiff's compensation with respect to Fund III would be "10% gross promote." *Id.* ¶ 33. After the plaintiff's termination, the plaintiff released the defendant from any claims that he had against it, *except* for an enumerated few, including "Melling's carried interests" in Funds I, II, and III, which, the settlement agreement confirmed, consisted of "2% of the gross promote paid to the Company" for Fund I, "10% of the gross promote paid to the Company" for Fund II, and "10% of the gross promote paid to the Company" for Fund III. *Id.* Ex. D, at 2–3. The settlement agreement thus did not create the plaintiff's claimed entitlement to 10% of the Fund III "gross promote"; it preserved it. *See also id.* at 6 ("This Settlement Agreement . . . supersedes all prior agreements or understandings, written or oral, between the parties, *except* those governing the Funds referenced [above]." (emphasis added)).

The defendant was thus mistaken to premise its jurisdictional argument on the notion that "Plaintiff's claims all arise directly and completely from his termination agreement" (Def.'s Br. 3). To the contrary, "Mr. Melling is also suing on the basis of his original compensation agreement covering his employment with HPI regarding Fund III." Pl.'s Opp'n 20, ECF No. 27-8. The question then is whether the defendant's transaction of business in New York has an articulable nexus or substantial relationship to the alleged agreement to pay the plaintiff

7

10% of the "gross promote" on Fund III in exchange for the plaintiff's work on behalf of that fund.

Case law supports an exercise of personal jurisdiction over the defendant in such circumstances. For example, in *Williams v. Preeminent Protective Services, Inc.*, 81 F. Supp. 3d 265 (E.D.N.Y. 2015), Judge Glasser of this district found personal jurisdiction over an out-of-state employer appropriate where the plaintiff was suing over unpaid commissions that she claimed that she earned while working from her home in New York. *See id.* at 268. In that case, "[a]lthough defendants believe[d] plaintiff to have worked remotely in many different locations, plaintiff state[d] that '[v]irtually all' of her work . . . was carried out from her home in Brooklyn." *Id.* (quoting record). Noting the "large amount of substantive work [plaintiff] undertook for the company while in Brooklyn," Judge Glasser found that she had "made a prima facie showing that defendants had a significant continuing relationship with her over the months she worked for them" and that there was "a 'substantial relationship' between the work plaintiff allege[d] she undertook for defendants and her claims in th[e] suit, which ar[o]se out of her termination by defendants." *Id.* at 271–72.

The defendants in *Williams* "argue[d] that '[a]n employee's decision to work from home in the forum state does not bind an entity to personal jurisdiction in that state.'" *Id.* at 271 (quoting brief). But that argument was rejected, because "[d]efendants hired [plaintiff] knowing that she would live and work in Brooklyn, and 'continued their communications with plaintiff here' for a sustained period of time." *Id.* (quoting *Fischbarg v. Doucet*, 880 N.E.2d 22, 28 (N.Y. 2007)). Similarly, the plaintiff in this case declares that it was "mutually understood" between him and the defendant's members, Sharp and David Kelsey, that he would perform half of his work from his home in New York. Melling Decl. ¶ 12. And he states that "[w]hen

[he] was working in New York, [he] was in regular communication with Mr. Sharp and Mr. Kelsey by phone and e-mail." *Id.* ¶ 18.[4]

Although this case differs from *Williams* in that, here, the plaintiff worked from New York only half of the time, I do not believe that that distinction makes a difference, since even "[a] single act within New York" can "satisfy the requirements of section 302(a)(1)" (*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 62 (2d Cir. 2012)) and the New York Court of Appeals requires only that the legal claim be "not completely unmoored" from the transaction of business (*D & R*, 78 N.E.3d at 1176 (quoting *Licci*, 984 N.E.2d at 900)).[5] What is more, the plaintiff here alleges not only that he worked from New York and met with investors in New York but also that he solicited and met with investors *from* New York, and Fund III ultimately successfully attracted investment from New York-based investors. *See* Am. Compl. ¶¶ 37–39; Sharp Decl. ¶ 4. Accordingly, "[w]hile [Sharp and Kelsey] may not have sought a unique benefit when they transacted business in New York, they nevertheless 'availed' themselves of the forum when they hired plaintiff to [work for them] while [he] lived in Brooklyn, which satisfies the requirements of the state's long-arm statute." *Williams*, 81 F. Supp. 3d at 272; *see also Jewell v. Music Lifeboat*, 254 F. Supp. 3d 410, 418 (E.D.N.Y. 2017) ("Defendants argue that the **only** nexus to New York in this case is that the Plaintiff happens to reside here, but that is not the case.").

---

[4] By contrast, Sharp declares that the defendant "expected [the plaintiff] would do his work from [Connecticut]" and "never agreed to or encouraged Mr. Melling to spend any significant amount of time working from his home in New York." Sharp Decl. ¶¶ 9–10. Insofar as the parties' declarations are in conflict, at this stage I resolve such disputes in the plaintiff's favor. *See Seetransport*, 989 F.2d at 580 (quoting *Taylor*, 912 F.2d at 431).

[5] I do not mean to suggest that personal jurisdiction would be available over the defendant in every state where the plaintiff made even a single business trip while working to promote Fund III. But inasmuch as fully half of the work that the plaintiff performed for the defendant occurred in New York, I am confident that New York courts may exercise personal jurisdiction over the defendant in a case arising out of that work.

9

The defendant cites to *Litton v. Avomex Inc.*, No. 08-CV-1340 (NAM/DRH), 2010 WL 160121 (N.D.N.Y. Jan. 14, 2010), in support of its argument that the plaintiff's cause of action doesn't arise from the defendant's activity in New York. *See, e.g.*, Def.'s Br. 14–15. *Litton* involved an out-of-state employer and a New York employee who alleged that he was unlawfully discriminated and retaliated against. *See Litton*, 2010 WL 160121, at *1. The court found a lack of personal jurisdiction and observed, "plaintiff has failed to establish, or even argue, that defendant's 'business activity' has any relationship or nexus to the subject matter of plaintiff's lawsuit." *Id.* at *5. For, the court explained, "[p]laintiff has not alleged that he suffered from any injury as a result of defendant's business in New York or from any transaction or sale of goods in New York." *Id.*

Preliminarily, I do not find the reasoning of *Litton* persuasive. *Cf. Winner v. Tryko Partners, LLC*, 333 F. Supp. 3d 250, 260–61 (W.D.N.Y. 2018) ("Plaintiff's claims of discrimination and retaliation would appear to 'relate' to her employment, which was contemplated to, and did, occur in New York. . . . Plaintiff's claims of discrimination and retaliation against Defendant cannot be characterized as 'unmoored' from the course of employment during which they occurred . . . ."). But putting that aside, the plaintiff here presents a stronger case than did the plaintiff in *Litton*. For the plaintiff here is alleging that he was insufficiently compensated for work that he performed substantially in New York. Whereas the alleged discrimination in *Litton* might not have been especially linked to the plaintiff's presence in the forum state, here the business that the defendant transacted in New York, with and through the plaintiff, is precisely the same business for which the plaintiff claims that he was not paid. While the defendant may be correct that its alleged refusal to pay the plaintiff took place in Connecticut (*see* Def.'s Reply 8, ECF No. 27-10), the plaintiff's cause

of action nevertheless has an articulable nexus to the defendant's business activities in New York.

On the record before me, therefore, I must deny the defendant's Rule 12(b)(2) motion.

## II. Failure to State a Claim

The defendant has also moved to dismiss under Rule 12(b)(6) two of the plaintiff's causes of action: his claim that the defendant violated the implied covenant of good faith and fair dealing and his claim that the defendant violated its fiduciary duty.[6]

### A. The Implied Covenant of Good Faith and Fair Dealing

Under Connecticut law,[7] "every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." *Geysen v. Securitas Sec. Servs. USA, Inc.*, 142 A.3d 227, 237 (Conn. 2016) (quoting *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 849 A.2d 382, 388 (Conn. 2004)). This implied covenant of good faith and fair dealing is breached when a party, in bad faith, "impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract." *Id.* at 237–38 (quoting *De La Concha*, 849 A.2d at 388). In this context, bad faith means "actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." *Id.* at 238 (quoting *De La Concha*, 849 A.2d at 388).

Here, the plaintiff alleges that, in addition to failing to pay him what he was owed, the defendant breached the implied covenant by "[f]ailing and refusing to reveal the value of the Fund III gross promote," "[f]ailing and refusing to reveal the percentage of the Fund III gross

---

[6] The defendant does not challenge the sufficiency of the plaintiff's breach-of-contract claim.
[7] Whereas the personal-jurisdiction question requires application of the law of New York, the forum state, the parties agree that the merits of the plaintiff's suit are to be determined under Connecticut law.

11

promote being paid to Mr. Melling," "[f]ailing and refusing to provide an accounting sufficient to allow Mr. Melling to verify whether the Fund III Payment was 'correct,'" and "[e]ngaging in bad faith negotiations designed to delay and obstruct." Am. Compl. ¶ 81. In sum, the plaintiff alleges, the defendant has "tak[en] deliberate steps to injure Mr. Melling's right to receive the benefit of the parties' agreements." *Id.* ¶ 79.

The defendant argues that the plaintiff's "conclusory allegations fall far short of evidencing the dishonest or sinister purpose necessary to state a claim for breach of the duty of good faith and fair dealing." Def.'s Br. 22. But the plaintiff's theory is quite clear: the defendant has "refused to disclose information . . . that Mr. Melling required to assess his contractual rights" in order to prevent him from ascertaining whether and by how much the defendant underpaid him. Am. Compl. ¶ 82. And the plaintiff alleges that the defendant has done so "purposefully" and "in bad faith." *Id.* ¶¶ 80, 82. That is enough to make out a claim that the defendant violated the implied covenant of good faith and fair dealing. *See Nwachukwu v. Liberty Bank*, 257 F. Supp. 3d 280, 295 (D. Conn. 2017) ("Bad faith is usually proved circumstantially . . . , and thus a plaintiff need not set forth a more specific or objective set of facts in the complaint in order to survive a motion to dismiss." (quoting *Singer v. Priceline Grp., Inc.*, No. 15-cv-1090 (VAB), 2016 WL 3976539, at *6 (D. Conn. July 22, 2016))).

The defendant also argues that this case is "a straightforward dispute concerning the meaning of contractual terms in the Settlement Agreement" and thus not an issue of bad faith. Def.'s Reply 10 n.7. It is true that "[t]he covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties." *Geysen*, 142 A.3d at 237 (quoting *De La Concha*, 849 A.2d at 388). But that is exactly what the plaintiff has alleged here. *See* Am. Compl. ¶ 79 ("HPI has deviated from [the parties'] common purpose and betrayed Mr. Melling's justified expectation by taking deliberate steps to injure Mr. Melling's

12

right to receive the benefit of the parties' agreements."); *see also* Pl.'s Opp'n 27 ("[T]his purported difference in legal interpretation is nothing more than post-hoc justification for HPI's self-interested refusal to pay Mr. Melling his share of the promote.").

The plaintiff's allegations that the defendant has violated the implied covenant of good faith and fair dealing are sufficient. *Cf. Geysen*, 142 A.3d at 241–42 ("If an employer can be shown to have interfered in bad faith with an employee's ability to secure his commissions, this would violate the reasonable expectation that his employer would not inhibit his ability to earn commissions he worked for under the contract.").

## B. Fiduciary Duty

The plaintiff has also alleged a breach of fiduciary duty. *See* Am. Compl. ¶¶ 86–98. The defendant argues that this claim should be dismissed "[b]ecause Plaintiff has failed to plead the existence of a fiduciary relationship." Def.'s Br. 27. For the reasons set forth below, I find that the plaintiff has adequately alleged a fiduciary relationship, and I thus decline to dismiss this cause of action.

"It is axiomatic that a party cannot breach a fiduciary duty to another party unless a fiduciary relationship exists between them." *Biller Assocs. v. Peterken*, 849 A.2d 847, 851 (Conn. 2004). Under Connecticut law, certain relationships are per se fiduciary, whereas in other contexts "a flexible approach determines the existence of a fiduciary duty, which allows the law to adapt to evolving situations wherein recognizing a fiduciary duty might be appropriate." *Iacurci v. Sax*, 99 A.3d 1145, 1154 (Conn. 2014) (citing *Falls Church Grp., Ltd. v. Tyler, Cooper & Alcorn, LLP*, 912 A.2d 1019, 1035 (Conn. 2007)). It is "well settled" that a fiduciary relationship "is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other." *Cadle Co. v. D'Addario*, 844 A.2d 836, 847 (Conn. 2004) (quoting *Konover Dev. Corp. v.*

*Zeller*, 635 A.2d 798, 805 (Conn. 1994)). That said, "'trust and confidence,' 'superior knowledge, skill or expertise,' and an expectation that one party is 'under a duty to represent the interests of the other' are typically necessary, but not always dispositive, conditions giving rise to a fiduciary duty in business settings." *Iacurci*, 99 A.3d at 1155. Rather, "cases considering whether ad hoc fiduciary duties existed in business relationships have turned on the presence of a special vulnerability"—that is, "whether there is a 'great opportunity for abuse of the confidence reposed in'" the supposed fiduciary. *Id.* at 1154–55 (quoting *Falls Church Grp.*, 912 A.2d at 1034).

Thus, in *Bagwell v. World Wrestling Entertainment, Inc.*, No. 3:16-cv-1350 (JCH), 2017 WL 3579609 (D. Conn. May 5, 2017), the court ruled that a fiduciary relationship was plausibly alleged by plaintiff professional wrestlers who were contractually owed royalty payments by the defendant professional-wrestling corporation. *See id.* at *14. In denying a motion to dismiss, the court observed that the defendant was alleged to have had "a 'great opportunity for abuse of the confidence reposed in' it when it collected and retained proceeds from direct sales of its video products, before informing plaintiffs of their entitlement to royalties." *Id.* (quoting *Saint Bernard Sch. of Montville, Inc. v. Bank of Am.*, 95 A.3d 1063, 1077 (Conn. 2014)). Because "plaintiffs relied on the accuracy of the royalty statements they received from WWE, with little means of regularly verifying WWE's compliance with the Booking Contracts," the court found that the plaintiffs had adequately alleged a fiduciary duty. *Id.*[8]

---

[8] The defendant cites to *PMI Shares, Inc., v. SIMA Int'l, Inc.*, No. LLICV166013981S, 2017 WL 1484035 (Conn. Super. Ct. Apr. 3, 2017), in which the court rejected the allegation of a similar fiduciary relationship because "[a] claim that the defendant may have had access to information, e.g., the amounts of royalties collected from its licensees, does not constitute a claim of superior knowledge, skill or expertise." *Id.* at *6; *see* Def.'s Br. 26. But the court in *PMI Shares* relied on the existence of "a clear and highly significant remedy for the defendant's breach"—the transfer of certain intellectual property to the plaintiff—which the court found "diminished the possibility that the defendant would abuse the contractual relationship and defraud, or take advantage of, the plaintiff." 2017 WL 1484035, at *6. No such remedy exists in this case. Moreover, to the extent that *PMI Shares* is in conflict with *Bagwell*, I find the latter's reasoning more persuasive.

14

The parallels to this case are obvious. Just as the plaintiffs in *Bagwell* relied on the defendant not only to pay them but to calculate how much they were owed, the plaintiff here is "entirely reliant on HPI to police its own performance" as the plaintiff "does not have access to" the defendant's confidential financial information (Am. Compl. ¶¶ 90–91). That is the sort of business arrangement that Connecticut courts have held "create[s] a fiduciary relationship between the parties." *Mankert v. Elmatco Prods., Inc.*, 854 A.2d 766, 769 (Conn. App. Ct. 2004).[9]

The defendant argues that "there is nothing to distinguish Plaintiff's and HPI's relationship from any other at-will employment arrangement" and thus that "[i]mposing a fiduciary duty here will open the floodgates." Def.'s Br. 27; *see also id.* at 25 ("*[A]ll* employees are reliant on their employers to pay the compensation they are due, and *all* employees rely on their employers to 'police [their] own performance' in that regard." (alteration in original)). But that argument does not account for the fact that most at-will employees know how much their employer is supposed to pay them and will know if the employer fails to do so. If the parties here, for example, had agreed that the plaintiff would be paid a flat sum of one million dollars, the defendant would have had no opportunity to pay him a lesser amount without his knowledge. The plaintiff's alleged entitlement to 10% of the Fund III "gross promote"— coupled with the plaintiff's inability to ascertain the true value of the Fund III "gross promote" (*see* Am. Compl. ¶¶ 88, 91)—are what make the allegations of a fiduciary duty here plausible. *See Iacurci*, 99 A.3d at 1155 ("The *unique* element that inheres a fiduciary duty to one party is an

---

[9] The defendant argues that *Bagwell* is distinguishable from this case because *Bagwell* involved "continuing obligations to make royalty payments" whereas here "HPI's alleged obligation to pay Plaintiff is not ongoing or reoccurring." Def.'s Br. 26. Although that is certainly a difference, it in no way renders the reasoning of *Bagwell* inapplicable. Moreover, the plaintiff is seeking a single payment *now* only because all the previous payments that the defendant allegedly owed him have already been made (*see* Am. Compl. ¶ 50). According to the complaint, at the time the plaintiff was terminated, the defendant did have an *ongoing* obligation to pay the plaintiff his contractual share of the "gross promotes" from each of Funds I, II, and III. *See id.* ¶¶ 30, 32–33, 45–46.

15

elevated risk that the other party could be taken advantage of—and usually unilaterally. That is, the imposition of a fiduciary duty counterbalances opportunities for self-dealing . . . .").

## CONCLUSION

For the foregoing reasons, the defendant's motion to dismiss is denied.

So ordered.

_____/s/_____
Allyne R. Ross
United States District Judge

Dated:    January 16, 2019
          Brooklyn, New York